**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DONALD CALLOWAY,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 06 C 3241 |
| ) | |
| **KEN BARTLEY,** ) | |
| ) | |
| Respondent. ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Margie Murray died as a result of a gunshot on March 20, 1979. On December 6, 2001, Petitioner Donald Calloway was arrested and subsequently charged with murder in connection with Ms. Murray's death. Mr. Calloway pled not guilty and was tried before a jury in the Circuit Court of Cook County. On April 23, 2004, Mr. Calloway was convicted of voluntary manslaughter. The Circuit Court found Mr. Calloway eligible for an extended-term sentence, thereby sentencing him to a term of twelve years in prison. Mr. Calloway, currently in the custody of Ken Bartley, Warden of Pinckneyville Correctional Center, seeks relief under 28 U.S.C. § 2254(d)(1).

Mr. Calloway has exhausted his state court remedies as required under § 2254(b). The grounds on which Mr. Calloway presently seeks relief have been duly raised before the trial court and Illinois appellate courts. Mr. Calloway first asserts error, in violation of the Sixth Amendment and *Apprendi v. New Jersey*, 530

U.S. 466 (2000), by the trial court's imposition of an extended sentence as a result of a prior federal conviction. Specifically, Mr. Calloway takes issue with the trial court's finding that the conduct underlying a prior federal conviction gave rise to a theft by deception conviction under Illinois law. Second, Mr. Calloway challenges the trial court's refusal to instruct the jury on the lesser included offense of involuntary manslaughter, as a violation of the Due Process clause.

I.

It is undisputed that on the evening of Ms. Murray's death on March 20, 1979, she and Mr. Calloway, her ex-husband, met at a bar. They later left together and entered Ms. Murray's van, where Ms. Murray died of a gunshot. Mr. Calloway disposed of the victim's body and then fled to Texas. After some time passed, Mr. Calloway returned to Chicago and lived under the assumed name of Robert Ducks until 2001, when he was charged in a federal mail fraud scheme. He pled guilty to federal mail fraud in November 2001. After entering into the plea agreement, Mr. Calloway's identity and outstanding arrest warrant, in connection with Ms. Murray's death, were discovered. He was arrested by the Harvey Police Department ("HPD").

Mr. Calloway does not dispute that he shot Ms. Murray; his claim is that this was the result of a struggle. At trial, the State presented evidence of two statements made by Mr. Calloway to

2

police. The first was a written statement given on December 7, 2001, which was destroyed by Mr. Calloway's then-wife, Renee Ducks, who was present at the interview. HPD Detective William Martin testified he reviewed the statement before it was destroyed, and that it described a verbal confrontation with Ms. Murray inside the vehicle, which turned into a physical confrontation. Ms. Murray then pulled a gun from her purse and when Mr. Calloway attempted to take the gun it went off, shooting her in the head. The second statement was videotaped on December 8, 2001. Mr. Calloway similarly described an escalating confrontation, during which Ms. Murray pulled a gun from her purse which he tried to wrestle from her. As they continued to struggle, the gun fired while pointing at Ms. Murray. On both occasions, the State was free to interview Mr. Calloway at length and as it deemed necessary; Mr. Calloway did not exercise his right to have an attorney present.

The State's evidence consisted of Mr. Calloway's two statements to police, an expert forensic pathologist, and ten fact witnesses. The expert forensic pathologist, Dr. Shaku Teas, testified that the distance from which the shot that killed Ms. Murray was fired was "probably over a foot," because there was no stippling (specks of gun powder embedded in the skin) near the wound. Dr. Teas also testified Ms. Murray did not have any bruising on her body, particularly on her wrists or hands. The remainder of the State's witnesses were not present in the van at

3

the time of Ms. Murray's death or otherwise purported to personally know what had happened inside the van. These were: Frederick Morris, who saw Mr. Calloway and Ms. Murray leave the bar together on the evening of her death; (2) Frederick Joseph, the HPD detective who investigated Ms. Murray's death in 1979; (3) David J. Brundage, a ballistics expert; (4) Zakary T. Freeze, the probation officer that conducted the pre-sentence investigation in Mr. Calloway's 2001 federal mail fraud conviction; (5) Joseph D. Thomas, the sergeant in charge of the HPD detective division at the time of Mr. Calloway's arrest in 2001; (6) Molly K. Perryman, the victim's sister; (7) Jessica Christmas, the victim's daughter; (8) Barbara Revelle, the HPD officer in charge of the evidence lock up; (9) William Martin, the HPD investigator who interviewed Mr. Calloway upon his arrest in 2001; and (10) Assistant State's Attorney Shawn Concannon, who took Mr. Calloway's videotaped statement.

The defense presented two fact witnesses and an expert witness at trial. One witness, Ken Scott, testified Ms. Murray carried a gun in her purse. The other witness was detective Thomas, who was re-called by the defense, and testified the HPD conducted no further investigation after Mr. Calloway gave the videotaped statement. The expert witness, forensic pathologist Dr. Larry Blum, testified that the direction of the wound track, the lack of stippling, autopsy report, death certificate, and morgue

photographs were not inconsistent with Mr. Calloway's statements of a struggle.

After the jury returned its verdict of voluntary manslaughter, the trial court relied on Mr. Calloway's prior federal conviction to impose an extended sentence of 12 years.[1]  Voluntary manslaughter had a sentencing range of three to seven years. Ill. Rev. Stat. 1979, ch. 38, par. 9-2(c) and par. 1005-8-1(a)(5). The facts surrounding Mr. Calloway's prior conviction are at issue here and must be examined. The federal indictment laid out a mail fraud scheme in which Mr. Calloway (charged as Robert Ducks) was alleged to be one of six real estate agents who assisted in buying and selling property on behalf of a company called Easy Life. Easy Life purchased and rehabilitated properties, and defendant solicited buyers for these properties. When a potential buyer did not qualify for a mortgage, Mr. Calloway made misrepresentations to the United States Department of Housing and Urban Development ("HUD"), which in reliance on those misrepresentations provided mortgages and mortgage insurance to otherwise unqualified buyers. Mr. Calloway's plea agreement set forth the maximum statutory sentence of five years and that his sentence under the U.S. Sentencing Guidelines (without a downward departure for cooperating

[1]Mr. Calloway elected to be sentenced under the law in effect at the time of the offense. Therefore, the trial court imposed the extended sentence under the 1979 Illinois Uniform Code of Corrections, Ill. Rev. Stat. 1979, ch. 38, par. 1005-5-3.2(b)(1).

with federal investigators) was 30 months imprisonment.

## II.

Petitioner faces a steep burden under § 2254(d)(1). Habeas corpus relief cannot be awarded to a state prisoner when a state court simply misapplies established constitutional principles to the facts of the case. 28 U.S.C. § 2254(d)(1)(1996); *Williams v. Taylor*, 529 U.S. 362, 389 (2000). Relief is available only when the state court determination was "contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For a state court's decision to be reviewable because it is "contrary to" clearly established federal law, the decision must be "substantially different" from the relevant Supreme Court precedent; "the word 'contrary' is commonly understood to mean 'diametrically different' or 'mutually opposed.'" *Williams*, 529 U.S. at 405. A state court decision is contrary to Supreme Court precedent if it contradicts that decision or reaches a different result on facts that are materially indistinguishable. *Id.* at 413. In assessing whether a state court decision involves "an unreasonable application of . . . clearly established" federal law, the question is "whether the state court's application of federal law was objectively unreasonable." *Id.* at 409. The Supreme Court has stressed that "the most important point is that an unreasonable application of federal law

is different from an incorrect application of federal law." *Id.* at 410 (emphasis omitted).

Section 2254(e)(1) also provides for great deference to the fact-finding of the trial court, stating: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State shall be presumed to be correct. The application shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### A. Imposition of An Extended Sentence

Mr. Calloway argues the trial court erred in imposing an extended sentence of 12 years for his voluntary manslaughter conviction. The trial court based the extended sentence on his prior federal conviction for mail fraud, which it found to be analogous to the crime of theft by deception under Illinois law. According to Mr. Calloway, the trial court made improper factual findings that increased his sentence beyond the statutory maximum and that are directly contrary to *Apprendi*. 530 U.S. at 490.

On September 9, 2005, the Appellate Court of Illinois, First Judicial Circuit, issued an unpublished order affirming Mr. Calloway's conviction and sentence. *People v. Donald Calloway*, No. 01 CR 031608, slip. op. (Ill. App. Ct. Sept. 9, 2005). The court reviewed petitioner's *Apprendi* claim and found the sentence was

proper. It held that in finding "the fact of a prior conviction,"
a court may make determinations as to whether the conviction
qualifies a defendant for a sentencing extension without
implicating *Apprendi*. *People v. Donald Calloway*, slip. op. at 15
(citing *Shepard v. United States*, 544 U.S. 13, 16 (2005)). Thus,
although classified differently, a federal conviction could be used
to extend Mr. Calloway's sentence in Illinois so long as the trial
court found it was the "same or greater class felony" as voluntary
manslaughter, a Class 3 felony. *Id.* at 12. Where the amount at
issue exceeds $100,000, theft by deception is classified as a Class
1 felony. 720 ILCS 5/16-1(b)(6). Therefore, a theft by deception
conviction in Mr. Calloway's case, where the amount at issue was
approximately $132,000, qualified as a same or greater class felony
as voluntary manslaughter. *Id.* at 11. The court also rejected the
argument that the trial court's approach required a resolution of
a factual dispute. *Id.* at 14-15. It found the facts contained in
Mr. Calloway's federal plea agreement sufficiently established the
elements of the crime of theft by deception. *Id.* at 15-16. Citing
Mr. Calloway's plea agreement, the court concluded that while the
facts showed that the buyers, and not Mr. Calloway, obtained the
mortgages and insurance from HUD, he was still an active
participant in the successful scheme to defraud HUD. *Id.* Finally,
the court rejected the argument that the trial court was required
to apply the Illinois mail fraud statute instead of theft by

deception. The court held it was not bound to do so under any identifiable legal authority. *Id.* at 16-17.

A court relying on the "fact of a prior conviction" as a reason for imposing an extended sentence may do so without proof beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. The Supreme Court has held there is no right to a jury trial to determine whether a defendant should receive an enhanced sentence as a recidivist. *Almendarez-Torres v. United States*, 523 U.S. 224, 227 (1998). The scope of this exception to the Sixth Amendment right to a jury trial has been recently examined by the Supreme Court, in a context similar to the one presented by Mr. Calloway's situation, in *Shepard*, 544 U.S. at 13. This was the case cited by the Illinois appellate court. In *Shepard*, the district court had the task of determining how to classify a previous state conviction for purposes of sentencing under the Armed Career Criminal Act ("ACCA"). ACCA mandates a minimum 15-year prison sentence for anyone possessing a firearm after three prior convictions for serious drug offenses or violent felonies. *Id.* at 15. In that case, the defendant's prior conviction arose from his plea of guilty to violating a Massachusetts burglary statute that criminalized trespassing not only into buildings and structures, but also into boats and motor vehicles. *Id.* at 16. In contrast, only burglaries committed in a building or enclosed space ("generic burglary"), not in a boat or a vehicle, were recognized as "violent

9

felonies" under ACCA. *Id.* at 15-16. Therefore, the issue arose because the Massachusetts statute criminalized conduct that went beyond "generic burglary" under ACCA and none of the charging documents or admissions incident to Shepard's guilty plea indicated the specific nature of the burglary under the statute. The Supreme Court held that a court "determining the character of an admitted burglary is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Id.* at 16.

The Court in *Shepard* indicated it was troubled by the Sixth Amendment implications of allowing the sentencing court to conduct an evidentiary inquiry beyond the materials it had just deemed permissible. *Id.* at 24-25; *see also id.* at 27-28 (Thomas, J. concurring). The holding in *Shepard* was intended to ensure that a defendant was "necessarily" convicted of a generic burglary, *id.* at 24, and restricted the trial court from engaging in factfinding about the particulars of a defendant's conduct that are "too much like the findings" deemed impermissible under *Apprendi*. *Id.* at 25. Justice Thomas concurred, wanting to overrule the entire "fact of a previous conviction" exception as provided in *Almendarez-Torres*. *Id.* at 28.

In the instant case, although the trial court did not initially consider the plea agreement in determining Mr. Calloway's

sentence, petitioner concedes it presented the court with the plea agreement in its motion for reconsideration. Therefore, it was before that court prior to Mr. Calloway's sentence becoming final and appealable. The appellate court also had available the plea agreement and cites its contents in its decision in *People v. Donald Calloway*, slip. op. at 5. *See Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (citing *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003) (under § 2254 courts must review the decision of the last state court to rule on the merits of petitioner's claim)). Accordingly, I must decide whether the determination that Mr. Calloway's plea agreement supported a theft by deception conviction, and hence an extended sentence,[2] is "contrary to, or an unreasonable application of" *Apprendi*.

Petitioner first argues that the plea agreement does not support a theft by deception conviction; therefore the trial court necessarily had to find additional facts in order to make its determination. In relevant part, the plea agreement provides:

> Robert Ducks [a.k.a Donald Calloway], and other persons both known and unknown to the Grand Jury, devised, intended to devise, and participated in a scheme and

[2]Although the trial court imposed the extended sentence under the 1979 Illinois Uniform Code of Corrections, because Mr. Calloway's federal mail fraud conviction did not take place until 2002, the determination of whether that crime constituted a "same or greater class felony" was conducted in relation to the 2002 criminal code and classification of felonies. Mr. Calloway argued in favor of this. Furthermore, Illinois mail fraud, argued by Mr. Calloway to be the appropriate Illinois counterpart to federal mail fraud, was not codified as an offense in Illinois until 2000.

artifice to defraud and to obtain money and property from HUD and the Lenders, by means of materially false and fraudulent pretenses, representations, and promises well-knowing at the time that the pretenses, representations, and promises were false when made.

. . . .

Although many of the buyers did not legitimately qualify for a mortgage, defendant Ducks provided the buyers with cash or money orders in order to assist the buyers in misrepresenting their qualifications for a mortgage. . . . After defendant Ducks gave the money to the buyers or their friend/relative, defendant Ducks instructed the buyers to withdraw the money from the relative's account and place the money in their own account. Finally, defendant Ducks instructed the buyers to return the money to Easy Life to be used as part of the down payment at the time of closing.

. . . .

Defendant Ducks and his co-defendants submitted these fraudulent Gift Letter/Affidavits to the Lenders and the Gift Letters/Affidavits became a part of the closing packages for the buyers. The defendants knew that the Lenders and ultimately HUD relied on the misrepresentations in the Gift Letters/Affidavits in determining whether to issue and/or insure a mortgage for the buyer.

Because of the misrepresentations to the Lenders and HUD made and caused by defendant Ducks regarding the source of the buyers' gifts, the Lenders and HUD provided mortgages and mortgage insurance to buyers who would otherwise be unqualified for such mortgages and mortgage insurance. . . .

HUD has suffered a loss due to default or foreclosure on certain properties sold by defendant Ducks. Accordingly, the amount of loss attributable to defendant Ducks is $132,868.

(Plea Agreement at 2-4.)

Theft by deception occurs when a person knowingly "[o]btains by deception control over property of the owner." 720 ILCS 5/16-

1(a)(2). "Obtain" is defined as follows: "[i]n relation to property, to bring about a transfer of interest or possession, whether to the offender or to another." 720 ILCS 5/15-7(a). There is also a statutory definition for "obtains control," which states "the phrase 'obtains or exerts control' over property, includes but is not limited to the taking, carrying away, or the sale, conveyance, or transfer of title to, or interest in, or possession of property." 720 ILCS 5/15-8. On the face of the statute, the relationship between these two statutory definitions is unclear. However, the Illinois Supreme Court has identified the elements of this crime as: "(1) the victim was induced to part with money; (2) the transfer of the money was based upon deception; (3) defendant intended permanently to deprive the victim of the money; and (4) defendant acted with specific intent to defraud the victim." *People v. Kotlarz*, 193 Ill.2d 272, 299, 738 N.E.2d 906, 919 (2000); *see also People v. Rohlfs*, 322 Ill.App.3d 965, 970, 752 N.E.2d 499, 502-03 (4th Dist. 2001) (examining statutory definition of "obtain" and not "obtains control" in determining a sufficiency challenge to a theft by deception conviction). Therefore, as determined by the Illinois courts, the applicable statutory definition appears to be that of "obtain."[3]

Mr. Calloway's plea agreement contains sufficient facts to satisfy the elements of theft by deception as set forth by the

---

[3]Petitioner has not provided any contrary authority.

Illinois Supreme Court. The victim in this case, HUD, was induced to part with money by providing unqualified buyers with mortgages. The plea agreement states that "[b]ecause of the misrepresentations to the Lenders and HUD made and caused by defendant [Calloway] regarding the source of the buyers' gifts, the Lenders and HUD provided mortgages and mortgage insurance to buyers who would otherwise be unqualified for such mortgages and mortgage insurance." (Plea Agreement at 4.) The mortgages were based upon deception; Mr. Calloway provided the unqualified buyers with cash or money in order to assist the buyers in misrepresenting their qualifications for a mortgage. (Id. at 3.) Mr. Calloway knew these buyers were unqualified "because their income and assets were too low to qualify for a mortgage." (Id.) Mr. Calloway also admitted to intending to "defraud and to obtain money and property from HUD and the Lenders, by means of materially false and fraudulent pretenses, representations, and promises well-knowing at the time that the pretenses, representations and promises were false when made." (Id. at 2.) Finally, "HUD has suffered a loss due to default or foreclosure on certain properties sold by defendant." (Id. at 4.) Accordingly, petitioner's argument that the sentencing court necessarily had to find additional facts, specifically that Mr. Calloway obtained control over the property in order to enhance Mr. Calloway's sentence, must fail in light of the elements of theft by deception as set forth by the Illinois

14

Supreme Court, and the contents of the plea agreement.

Alternatively, petitioner argues that it was improper for the court to look at the plea agreement in the first place, regardless of whether it contains sufficient facts for a theft by deception conviction. However, this is not "contrary to or an unreasonable application of" the law as presently articulated by the Supreme Court.[4] As in *Shepard*, this case involved a determination of the nature of Mr. Calloway's prior conviction. Despite the uncertainty surrounding the classification of the prior conviction in *Shepard*, the Supreme Court did not find a Sixth Amendment violation or that the defendant was entitled to a jury trial on that issue. *Shepard* held that a "collateral trial" on that issue was not worth conducting. *Shepard*, 544 U.S. at 23; *see also Unites States v. Browning*, 436 F.3d 780, 782 (7th Cir. 2006)(examining *Shepard*). Accordingly, the state courts' reliance on the plea agreement to determine the nature of Mr. Calloway's prior conviction, along with its counter-part under Illinois law, was not "contrary to or an unreasonable application of" *Apprendi* in light of *Shepard* and the continuing validity of *Almendarez-Torres*. *See United States v. Pittman*, 418 F.3d 704, 709 (7th Cir. 2005) ("Even post-*Booker* . . . evidence of a prior conviction that would increase the statutory maximum does not need to be submitted to a jury"); *see also United*

---

[4]Although the validity of *Almendarez-Torres* has been called into question, it remains good law today.

*States v. Carrillo-Beltran*, 424 F.3d 845, 848 (8th Cir. 2005) (rejecting argument that "nature of a prior conviction is to be treated differently from the fact of a prior conviction"); *United States v. Moore*, 401 F.3d 1220, 1225 (10th Cir. 2005) (classification of felony as "violent" is "a question of law and not fact, the Sixth Amendment does not require that determination to be made by a jury"). Mr. Calloway, therefore, is not entitled to relief under § 2254 on this claim.

### B. Involuntary Manslaughter Instruction

Mr. Calloway also argues the trial court erred by failing to instruct the jury on the lesser included offense of involuntary manslaughter. Under the law in Illinois in 1979, involuntary manslaughter is committed when a person, without lawful justification, unintentionally kills an individual by performing acts that are likely to cause death or great bodily harm, and these acts are performed recklessly. Ill. Rev. Stat. 1979, ch. 38, par. 9-3(a). A person acts recklessly when "he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, . . . and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1979, ch. 38, par. 4-6. The trial court rejected the instruction stating there was an absence of evidence of recklessness, as required by the Illinois involuntary manslaughter statute.

The appellate court affirmed, finding that Mr. Calloway "was justified in struggling with Murray in order to protect himself after Murray drew a weapon," and therefore his actions were not reckless. *People v. Calloway*, slip op. at 8. The court relied on *People v. Castillo*, 188 Ill. 2d 536, 723 N.E. 2d 274 (1999). There, a jury convicted the defendant of murder after testimony that the defendant and the victim initially engaged in a struggle inside of a bar. The two were separated and the defendant later called the victim outside of the bar, where the struggle resumed. Two eye witnesses said they saw the defendant point the gun at the victim from a distance of 10 or more feet and then shoot twice, striking the victim once. The Illinois Supreme Court found, on the record before it, there had been no evidence of recklessness before the trial court. Therefore the defendant was not entitled to an involuntary manslaughter instruction. The court rejected the argument that defendant's testimony "that he struggled with the victim after the victim drew a gun and threatened to injure him" was evidence of recklessness. Instead, the court found it was "evidence that defendant acted with regard to a justifiable risk of injuring the victim in order to protect himself." *Id.* at 541.

In the Seventh Circuit, a failure to include an instruction on a lesser included offense does not violate the Constitution unless it amounts to a fundamental miscarriage of justice. *Armstead v. Frank*, 383 F.3d 630, 632 (7th Cir. 2004) (omission of a lesser

17

included instruction may implicate Sixth and Fourteenth Amendment rights if resulting conviction violates due process); *Robertson v. Hanks*, 140 F.3d 707, 710 (7th Cir. 1998) (citing *Nichols v. Gagnon*, 710 F.3d 1267, 1269 (7th Cir. 1983)). A fundamental miscarriage of justice occurs from a failure to tender an instruction when "credible evidence in the record would support a verdict based on [the lesser included] instruction." *Wilson v. McCaughtry*, 994 F.2d 1228, 1238 (7th Cir. 1993) (quoting *Taylor v. Gilmore*, 954 F.2d 441, 451 (7th Cir. 1992)); *United States ex rel. Reeves v. Battles*, No. 99 C 1613, 2000 WL 1466201, at *4 (N.D. Ill. Aug. 30, 2000) (Gettleman, J.). "At a minimum, petitioner must show that there was 'unequivocally strong' evidence in the record by which a jury could have found each element of the proposed instruction, and that the other evidence does not disqualify him from using the proposed defense." *Id.* (quoting *United States ex rel. Peery v. Sielaff*, 615 F.2d 402, 402 (7th Cir. 1979)). A showing that the trial court should have given the instruction as a matter of state law is not enough; a petitioner must demonstrate that had the omitted instruction been given, it is improbable that he would have been convicted of the greater offense. *See Everette v. Roth*, 37 F.3d 257, 262 (7th Cir. 1993); *Nichols*, 710 F.3d at 1269. As a practical matter, this last inquiry appears to be a challenge to the sufficiency of the evidence. *See, e.g., Robertson*, 140 F.3d at 711 ("[petitioner] does not challenge the sufficiency of the evidence

18

which the jury found established beyond a reasonable doubt his guilt for dealing cocaine.").

Mr. Calloway's case presents a truly troubling set of circumstances. The record provides that Mr. Calloway has consistently maintained he engaged in a struggle with Ms. Murray over a gun. First, Detective Martin testified Mr. Calloway's first written statement provided:

> he had met his wife in the Family Den in Chicago, and they had left the Den in her van, and a confrontation, verbal confrontation they had within the vehicle, which turned in a physical confrontation, and that she pulled a gun from her purse, and he attempted to take the gun from her and the gun went off, striking her in the head.

(Trial Tr. April 21, 2004 at 48.) Second, Mr. Calloway's videotaped statement provided:

> Q. What, if anything, happened after that and during the argument?
> A. I, I explained to Margie how miserable things were, you know, and she, she made a comment to something about, I'll put you out of your misery and reached into her purse and pulled out a weapon.
> Q. Do you remember where her purse was?
> A. No, I don't remember exactly where it was.
> Q. When she pulled out that gun what did she do with it?
> A. She pointed it at me and waved it several times.
> Q. Do you remember what the gun looked like?
> A. No.
> Q. Do you remember what Margie's purse looked like?
> A. No.
> Q. Had you ever seen Margie with a gun before?
> A. No, not, not to - - not that I can remember.
> Q. Now, you said that Margie pointed the gun, where was she pointing the gun?
> A. Directly at me.
> Q. What did you do?
> A. I, I argued with her for, I guess, for a couple of seconds and then reached and grabbed the gun and tried to take it away or turn it away from me.

Q. Where did you touch the gun?
A. I, I imagine I touched the gun on the barrel and the, and the hand or over her hand holding the grip.
Q. And what did you do? How did you try to get it away?
A. I, I immediately tried to turn it away from me towards, the front of the van, towards the window.
Q. And were you successful?
A. Yes.
Q. Okay. What happened with the gun then?
A. We continued to struggle and eventually the, the weapon ended up pointing at Margie and it discharged.
Q. And it discharged. Where did it hit Margie?
A. In the head, I think.
Q. Okay. And do you know how that gun discharged?
A. No.
Q. Okay. After the gun discharged what did you do?
A. I panicked and started screaming and hollering and I tried to reach to see if there was any pulse or anything on Margie.

(Pet. Exh. 2 at 8-10.) These statements constitute the only pieces of direct evidence in the case, the remaining case was circumstantial.

Mr. Calloway's statements are "credible evidence" that would support a finding of recklessness and an involuntary manslaughter verdict. According to his statement, Mr. Calloway and Ms. Murray had been arguing when Ms. Murray initially drew the gun in the van, pointed it at him "and waved it several times." In neither statement, however, does Mr. Calloway state he was afraid for his life or that he felt justified in struggling for the gun, or that he intended to even point the gun at or shoot the victim. Struggling over a gun, in the absence of justification, has been found to be reckless. See *People v.* Roberts, 265 Ill.App.3d 400, 403, 638 N.E.2d 359, 361 (Ill. App. Ct. 1994); *People v. Robinson,*

20

163 Ill.App.3d 754, 516 N.E.2d 1292 (Ill. App. Ct. 1987). The remaining physical and testimonial evidence at trial did not disqualify Mr. Calloway from arguing involuntary manslaughter. The physical evidence in this case was limited to the autopsy findings, as described by Dr. Teas in her testimony, and the evidence concerning the gun and bullet. Dr. Teas' testimony concerning the autopsy report provided that Ms. Murray died as a result of a gun shot wound to the head, the bullet entering the right temple area above the victim's right ear. During the autopsy, Dr. Teas recovered a large bullet fragment from the left side of the brain and a small bullet fragment in tissue just underneath the entrance wound. (Trial Tr. April 21, 2004 at 97-98.) Although she did not include this observation in the original autopsy report, Dr. Teas also testified she did not see any stippling near the victim's wound and, therefore, believed the distance between the gun and the victim was "probably over a foot." (*Id.* at 102.) Similarly, she also testified the wound track was at "a tiny bit or upward angle," possibly of 10 or 20 degrees, which was also not listed in the autopsy report. (Id. at 103.)

The larger bullet fragment recovered during the autopsy was tested, and it was determined that it was shot by a .32 caliber handgun owned by Ms. Murray. This gun had been tested in 1979. After that, the gun and both bullet fragments were lost while in police custody and could never be re-tested. The gun was never

tested for fingerprints, nor were the victim's hands tested for residue analysis to determine whether her hands had been on the gun at the time of discharge. Mr. Calloway's account of a struggle is not precluded by any of this evidence. The determination that it was Ms. Murray's gun that discharged actually corroborates Mr. Calloway's statement.

The verdict reveals the jury found Mr. Calloway's statements credible, despite the State's argument that this was a cold-blooded execution. Although charged with first degree murder, Mr. Calloway was convicted of voluntary manslaughter. In order to reach this verdict, the jury was first instructed:

> To sustain either the charge of murder or the charge of voluntary manslaughter, the State must prove the following propositions.
> First proposition.
> That [] the defendant performed the acts which caused the death of [the victim] and,
> Second proposition.
> That when the defendant did so, he intended to kill or do great bodily h[a]rm to [the victim] or,
> He knew that such acts would cause death to [the victim], or,
> He knew such acts created a strong probability of death or great bodily harm to [the victim].
> And third proposition.
> That the defendant was not justified in using the force which he used.
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, your deliberation should end and you should return a verdict of not guilty.

(Trial Tr. April 22, 2004 at 183.) The first proposition was not in dispute in this case. The second proposition has three options,

the baseline being that "he knew [the acts which caused the death of the victim] created a strong probability of death or great bodily harm." The final proposition was that Mr. Calloway was not justified in his actions. Consistent with this final proposition, the jury rejected Mr. Calloway's self-defense claim. This instruction provided: "a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm." (Id. at 182.)

The jury was also instructed that it could find "a mitigating fact exists so as to reduce the offense of murder to the lesser offense of voluntary manslaughter." (Id. at 181.) Mr. Calloway had "the burden of proving beyond a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of voluntary manslaughter instead of murder." (Id. at 184.) The jury was instructed to return a verdict of voluntary manslaughter if "the defendant, at the time that he performed the act which caused the death of [the victim], believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable." (Id. at 185.)

Had the jury been instructed on involuntary manslaughter it would have been instructed as follows:

> To sustain the charge of involuntary manslaughter, the State must prove the following propositions:

> *First*: That the defendant performed the acts which caused the death of [the victim]; and
> *Second*: That the defendant performed those acts recklessly; and
> *Third*: That those acts were likely to cause death or great bodily harm.
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonably doubt, then you should find the defendant guilty.

Ill. Pattern Jury Instr.-Criminal 7.08 (1968 ed.); *see also* Ill. Pattern Jury Instr.-Criminal 7.08 (2006 ed.). Unquestionably, the jury would have found the State sufficiently proved the first and third propositions: the first was not disputed and the third is a lower threshold than the "strong probability of death or great bodily harm" baseline showing required under the murder/voluntary manslaughter instruction. The second proposition houses the recklessness requirement, which the trial and appellate courts narrowed as the justification issue (i.e. because Mr. Calloway was justified in shooting Ms. Murray, he could not have also been reckless).

In light of the record and the jury's verdict, the Illinois appellate court's decision appears fundamentally misplaced. The appellate court stated: "Since defendant was justified in struggling with Murray in order to protect himself after Murray drew a weapon, defendant's actions were not reckless." *People v. Calloway*, slip op. at 8 (citing *Castillo*, 188 Ill. 2d at 541.) In fact, the jury found *beyond a reasonable doubt* that Mr. Calloway was not justified in his actions. Therefore, the Illinois

24

appellate court's conclusion appears inconsistent with the record and verdict. Furthermore, under Illinois law, even if the trial court would have found conflicting evidence concerning recklessness, Mr. Calloway still had a right to an instruction defining the lesser included offense. *See People v. Jenkins*, 30 Ill.App.3d 1034, 333 N.E.2d 497 (Ill. App. Ct. 1977); 21 Ill. Law and Prac. Homicide § 156; *see also Nichols*, 710 F.2d at 1269 (examining federal law).

The facts presented by Mr. Calloway's situation are unique in many respects. Unlike in *Castillo*, the case relied on by the Illinois appellate court, the only pieces of direct evidence in the case were Mr. Calloway's own statements to law enforcement – there were no eyewitnesses. 188 Ill.2d at 538-39, 723 N.E.2d at 275-76; *see also Robertson*, 140 F.3d at 709 (no fundamental miscarriage of justice when police informant testified "that on the three occasions charged she observed [petitioner] deliver to the police officer what appeared to her to be cocaine and witnessed the officer pay [petitioner] for the contraband"); *Reeves*, 2000 WL 1466201, at *4 ("There was eyewitness testimony that petitioner repeatedly kicked [the victim] while [the victim] lay face down in the street.") *aff'd*, 272 F.3d 918, 921 (7th Cir. 2001) (there was no fundamental miscarriage of justice "[g]iven such substantial evidence of intentional misconduct"). The fatal injury here was not one that was inconsistent with Mr. Calloway's statement. *See*

*Wilson*, 994 F.2d at 1239 (where victim was a four year-old child that was kicked and punched until his stomach ruptured, petitioner "failed to direct [the court] to any evidence in record that can reasonably explain [the victim's] death in any way other way"). Mr. Calloway's statements are corroborated throughout parts of the record.

Although I find a credible evidentiary basis exists for an involuntary manslaughter instruction, petitioner must still show that it would be improbable for a reasonable jury to convict him of voluntary manslaughter. *See Everette*, 37 F.3d at 262; *Nichols*, 710 F.2d at 1269. The Seventh Circuit has not elaborated on how a petitioner would go about proving such a proposition, but has suggested this to be a challenge to the sufficiency of the evidence. *See Robertson*, 140 F.3d at 711; *Nichols*, 710 F.2d at 1271; *Peery*, 615 F.2d at 404 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) ("Due Process clause requires State in criminal prosecutions to prove guilt beyond a reasonable doubt)). In a case such as this one, this presents an impossible burden on the petitioner, for the practical distinction between voluntary and involuntary manslaughter on this record ultimately rests with the jury's credibility determination of Mr. Calloway's statements. On one hand, the jury did find him credible enough to reject the murder charge and find the existence of a mitigating factor by a preponderance of the evidence. On the other, the jury rejected his

self-defense claim. Overall, petitioner has not shown the record in this case precludes a finding of voluntary manslaughter.

Therefore, although I find the record sufficiently entitled Mr. Calloway to the lesser included instruction, I cannot conclude it improbable for a reasonable jury to convict Mr. Calloway of voluntary manslaughter. Accordingly, Mr. Calloway has not shown the existence of a fundamental miscarriage of justice and is not entitled to relief under § 2254.

III.

For the reasons set forth above, the petition for writ of habeas corpus is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: December 15, 2006